IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| v. | : | CRIMINAL NO. 16-130-2 |
| | : | |
| WHEELER K. NEFF | : | |

DEFENDANT'S AMENDED SENTENCING MEMORANDUM

I.   INTRODUCTION

Wheeler Neff is scheduled to be sentenced by the Court on April 17, 2018 following convictions for racketeering and fraud offenses.  As directed by the Court, the probation officer has prepared a Presentence Investigation Report ("PSI") in which the adjusted offense level is calculated as 39 with a resultant guideline sentencing range of 262 to 327 months imprisonment.  As demonstrated below, this range is improperly based upon intended loss and vulnerable victim enhancements without which the adjusted offense level would be 30 which in turn would reduce the advisory sentencing range to 97 to 121 months imprisonment.  Furthermore, this is a case in which even the reduced intended loss figure advocated by the defense significantly overstates the actual seriousness of the fraud crimes and as such a downward departure from guideline range would be appropriate.  Finally, in view of Mr. Neff's age, unblemished personal background and outstanding community support, a post-departure downward variance would also be more than justified in this case.  Accordingly and consistent with the so-called parsimony provision set forth in 18 U.S.C. § 3553(a), the Court should impose a sentence of 60 months imprisonment or less.

II.  ARGUMENT

   A.  Applicable Legal Principles

By now, the law that applies to sentencing is well-established and can be summarized succinctly. Under the Third Circuit's decision in United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006), the Court is required to follow a three-step process at sentencing. First, "Courts must continue to calculate a defendant's Guidelines sentence as they would have before Booker." Id. Second, the Court "must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker caselaw, which continues to have advisory force." Id. (internal brackets and quotations omitted). And third, Courts are "required to exercise their discretion by considering the relevant § 3553(a) factors in setting forth the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines." Id. (internal brackets, quotations and citations omitted). As for this final step, the Court is statutorily charged with the obligation of implementing "§ 3553(a)'s overarching instruction to impose a sentence sufficient, but not greater than necessary, to accomplish the sentencing goals advanced in [the statute]." Kimbrough v. United States, 552 U.S. 85, 111 (2007) (internal quotations omitted). With this analytical framework in mind, the defense will now turn to the issues that this Court will have to decide at sentencing.

   B.  The Guidelines Calculations And Defense Objections

The RICO offenses have no effect on the guideline calculations contained in the PSI because the adjusted offense level for those crimes is more than nine levels below the one that applies as a result of the fraud convictions. See U.S.S.G. § 3D1.4(c). Accordingly, the defense will confine its discussion to the fraud calculations. As correctly set forth in ¶ 82 of the PSI, the

base offense level for these offenses is 7 which is then subject to graduated increases under U.S.S.G. § 2B1.1(b)(1) based upon the amount of actual or intended loss that was either the result or object of the charged conspiracy. Here, the probation department has relied upon an intended rather than actual loss theory based upon an e-mail in which Mr. Neff said that his co-defendant was exposed to a possible monetary judgment in the Indiana class action in the range of $8 to $10 million. See PSI at ¶ 83. This conclusion increases the offense level by 20 and another two levels are then added because there were ten or more victims of the offense. Id. at ¶ 84. Yet another two levels are then added because the fraud involved the use of sophisticated means which are followed by further increases of four more levels on the ground that the victims of the conspiracy were both vulnerable and numerous. Id. at ¶¶ 85, 86 and 87. Next, Mr. Neff received yet another two-level increase in the base offense level because he used his skills as a lawyer to facilitate the commission of the crimes followed by another two-level increase based upon his testimony at trial. Id. at ¶¶ 88 and 89. In short, what began as a base offense level of 7 becomes after all of these specific-offense enhancements an adjusted offense level of 39 with a corresponding sentencing range of 262 to 327 months imprisonment

      For purposes of the guidelines calculations, the defense has raised two objections that the Court will have to resolve at sentencing. First, the defense objects to ¶ 83 of the PSI in which Mr. Neff is given a twenty-level increase in the offense level because "the defendants exchanged correspondence acknowledging that the loss could be as much as $10,000,000[.]" As discussed below, use of this figure is inappropriate in this case because it reflects a contingent and unlikely worst-case scenario rather than a realistic assessment of what the defendants subjectively had in mind when the conspiracy began in May of 2013 and thereafter. Second, the defense objects to the two-level increase that was based upon the notion that the victims of the fraud offense were

vulnerable and the additional two-level increase that was based upon their number.  See PSI at ¶¶ 86 and 87.  In this connection, while the victims of the RICO offenses may have been "specifically targeted and particularly susceptible because of their poor financial condition[,]" id. at ¶ 86; see also id. at ¶¶ 69 and 76 (using the exact same language to justify the exact same enhancements for the RICO offenses), that analysis does not apply to the fraud counts because the members of the class were at all relevant times represented by court approved class action experts who were not fooled by the scheme that the defendants were convicted of concocting.

     1.     The Loss Calculations

As this Court has noted in the past, "[a]n increase in a defendant's base offense level under U.S.S.G. § 2B1.1 is determined by the financial loss caused by the fraud."  United States v. Marguilies, 2010 WL 2375960 at *5 (E.D.Pa. 2010).  Under the application notes to § 2B1.1, the loss resulting from a fraud takes one of two forms – actual or intended – and it is the greater of the two which must be applied at sentencing.  See U.S.S.G. § 2B1.1 application note 3(A) ("loss is the greater of actual loss or intended loss").  In cases in which intended loss is used as the benchmark, the Court is required to calculate "the pecuniary harm that was intended to result from the offense" even though that harm "would have been impossible or unlikely to occur (e.g., as in a government sting operation or an insurance claim in which the claim exceeded the insured value)."  Id. (quoting from application note 3(A)(ii)).  However, the Third Circuit has expressly recognized that the "fraud guideline . . . has never endorsed sentencing based on the worst-case scenario potential loss[,]" United States v. Kopp, 951 F.2d 521, 529 (3d Cir. 1991) (emphasis in the original), and has further made it "clear that a district court errs when it simply equates potential loss with intended loss without deeper analysis."  United States v. Geevers, 226 F.3d 186, 192 (3d Cir. 2000).

Identifying precisely what form the "deeper analysis" required by <u>Geevers</u> is supposed to take is a more elusive matter. As this Court noted in <u>Marguiles</u>, the Third Circuit did not elaborate on that subject in <u>Geevers</u> but it did remark that "intended loss refers to a defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims." 226 F.3d at 192 (bracket and internal quotations omitted). This subjective-expectation analysis, in turn, requires the Court to determine what the defendant had in mind or sought to gain when he committed the crime. Where the Court has no direct evidence of that expectation in the form of a statement by the defendant, it is permitted to "draw inferences from the nature of the crime that he sought to perpetrate." <u>Id</u>. at 192. In other words, it is appropriate for the Court to consider, for example, in a bankruptcy fraud case where there was no actual loss "why most people would conceal assets" from the trustee and to infer in such a case an intent to "short-change creditors" based upon the fact that the defendant "concealed a large amount of property." <u>United States v. Free</u>, 839 F.3d 308, 322 (3d Cir. 2016) (bracket omitted).

In our view, application of these principles to this case compels the conclusion that the $10 million intended loss amount used to calculate the offense level in this case was erroneous. That figure represents precisely the sort of "worst-case scenario potential loss" that the Third Circuit has made plain cannot drive the guidelines calculation. Indeed, fairly read all that Mr. Neff's e-mail sought to communicate to his co-defendant was precisely what the worst-case scenario would be if the plaintiffs were ultimately able to obtain a monetary judgment in the full amount of the damages to which they were entitled under the Indiana statutes that were cited in the complaint. Put differently, the e-mail set forth nothing more than the "potential" exposure that the co-defendant faced in the Indiana lawsuit as opposed to a subjective expectation by Mr. Neff that damages in the amount of $10 million were about to be awarded and hence a scheme to

defraud the plaintiffs' lawyers had to be created and put into motion immediately to prevent this likely contingency from occurring. That is the sort of evidence that would be needed to justify the use of the e-mail's $10 million worst-case exposure estimation as a proxy for intended loss and it is completely lacking here.

A much more plausible and factually-based expression of Mr. Neff's subjective intent can be found in the conversation between Adrian Rubin and Charles Hallinan on August 28, 2013. The transcript of this conversation was marked as Government Exhibit 5E and what it shows is that what Mr. Neff was expecting to happen was a settlement of the case as opposed to a jury verdict in the amount of $10 million and that he believed that by involving Randy Ginger the matter could be resolved for $40,000. Accordingly, what he intended to gain for his client through the use of Randy Ginger was the difference between that sum and what he believed that the plaintiffs' lawyers would have obtained had Mr. Hallinan's status as a potential deep-pocket defendant been successfully concealed. While Exhibit 5E does not shed any light on that issue, it bears noting that the evidence at trial did reveal what amount the plaintiffs' lawyers believed was fair, adequate and reasonable after they discovered that Mr. Hallinan could have been joined as a defendant in the case. That sum was $260,000 which resulted in a greater payment on a per loan basis than the exact same plaintiffs' lawyers and class representative agreed to accept in the December 2013 settlement of a comparable class action.[1]

---

[1] That case involved a payday lender named Geneva Roth and its principal Mark Curry and was the subject of plaintiffs' lawyer Vess Miller's testimony at trial. Further, although the government disputes the idea that the conspiracy charged in Count Three was unsuccessful, the evidence at trial completely refutes that claim. Vess Miller testified on cross-examination that he could have joined Mr. Hallinan as a defendant in the Indiana lawsuit but chose not to do so for tactical reasons. Given this testimony, any suggestion that the defendants here were able to successfully conceal Mr. Hallinan's status as a potential deep-pocket defendant is nonsense.

The defense recognizes that use of what the plaintiffs' lawyers agreed to accept after they learned of Mr. Hallinan's status as a potential deep-pocket defendant does not answer the question of what the defendants feared the case might settle for if the plaintiffs' lawyers knew the truth.  There are, however, several e-mails from Kenneth Dubrow which speak to that issue including one to Susan Verbonitz dated December 2, 2013 in which Mr. Dubrow remarked that plaintiffs' lawyer Richard Shevitz "is likely looking for 300K, well above the pay grade."  The next day, Mr. Shevitz sent a letter to Mr. Dubrow in which he stated that he would accept the sum of $557,200 to settle the case.  In still another e-mail from Mr. Dubrow to the defendants dated December 9, 2013, he made reference to the "550K demand" and the "40K" that Susan Verbonitz had used as a "talking point" in the past.  All of these writings are dated after October 7, 2013 which is significant because it was on that date that an attorney from the United States Department of Justice sent plaintiffs' counsel a copy of a letter in which he stated that there was evidence that Mr. Hallinan owned Apex 1 Processing.  The defendants thus knew exactly what the total settlement figure was once Mr. Hallinan's status as a potential deep-pocket defendant became known and hence there is no need to speculate about their thoughts and expectations.[2]

Under these circumstances, the defense submits that the intended loss amount that the Court should apply is more than $250,000 but less than $550,000.  That sum would be based

---

[2] The documents referred to above are attached hereto for the Court's convenience and many were marked as exhibits at trial.  Furthermore, as the Court may recall Mr. Hallinan was confronted at his deposition in February 2014 with several corporate documents that identified him as either an officer or director of Apex 1 Processing and it was those corporate filings and the deposition testimony that prompted Mr. Miller to say that he could have joined Mr. Hallinan as a defendant in the lawsuit but chose not to do so for tactical purposes.  The plaintiffs' lawyers were nevertheless able to leverage the momentum that they seized at the deposition to convince Mr. Hallinan to abandon the "talking point" settlement sum of $40,000 and agree to resolve the case for $260,000.

upon the difference between what Mr. Neff wanted to settle the class action for as reflected in the August 28, 2013 statements by Mr. Hallinan, i.e., $40,000, and the settlement amount of $557,200 that was the subject of the December 3, 2013 demand letter, i.e., $517,200.  The use of this loss amount would also give effect to the principle expressed in Free that in a case such as this one where there was no actual loss because the conspiracy charged was unsuccessful, the Court is still permitted to draw the inference that the offenses set forth in the indictment were committed for a reason which in this case was to prevent the plaintiffs from getting what they demanded in settlement once they knew the truth.  Accordingly, the increase for intended loss required by § 2B1.1(b)(1) should be 12 levels rather than 20.

      2.      The Vulnerable Victim Enhancements

The vulnerable victim enhancement is governed by U.S.S.G. § 3A1.1(b)(1) and it applies where "the defendant knew or should have known that a victim of the offense was a vulnerable victim."  Additionally, another two-level increase is required when "the offense involved a large number of vulnerable victims[.]"  Id at § 3A1.1(b)(2).  Under Third Circuit precedent, this Court is required to use a three-part test in determining whether the enhancement applies and that test is as follows:

> (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was a nexus between the victim's vulnerability and the crime's ultimate success.

United States v. Zats, 298 F.3d 182, 186 (3d Cir. 2002) (internal quotations omitted).  While there is no requirement under the caselaw that the victim suffer any actual harm, what must be proven by the government is a nexus "between the victim's vulnerability and the defendant's scheme[.]"  United States v. Adeolu, 836 F.3d 330, 334 (3d Cir. 2016).

In this case, the probation officer applied the enhancement because in his view the victims of the Indiana fraud conspiracy "were specifically targeted and particularly susceptible because of their poor financial condition." See PSI at ¶ 86. This was the exact same language, however, that was used in the sections of the PSI that applied the enhancement to the two RICO offenses. Id. at ¶¶ 69 and 76. While an individual's poor financial condition may make him or her particularly susceptible to a payday lending racketeering conspiracy, the same cannot be said when the underlying crime is a fraud that is directed at members of a class action. That would be especially true when the members of the class were represented at all times by competent and capable lawyers who were court approved, specialized in class action litigation and were not in any event fooled by the scheme. Further and while we recognize that "§ 3A1.1 does not require that the defendant consciously have targeted the victim because of the latter's vulnerability or susceptibility[,]" United States v. Monostra, 125 F.3d 183, 190 (3d Cir. 1997), there is no proof in this case that the financial condition of the plaintiffs had anything to do with the reason why the fraud offenses were committed. The object of the conspiracy was to convince the plaintiffs' lawyers (and admittedly per an agency theory their clients) that Randy Ginger ran the lending operation and that Charles Hallinan had nothing to do with that business and thus could not be held personally liable. How the financial condition of the class members had any connection at all to this scheme or somehow made the plaintiffs more vulnerable or susceptible to this type of crime is a complete mystery to us.

The Third Circuit has made it plain "that the enhancement may not be applied absent a showing that the victim's vulnerability or susceptibility facilitated the defendant's crime in some manner." Monostra, 125 F.3d at 190. The court further stated in Monostra that the definitions of the terms "susceptible" and "vulnerable" both "imply that the weakness of the object contributes

9

to the successful operation of the subject" and thus the use of those terms "in § 3A1.1 indicates that the enhancement is to be applied when the defendant has taken advantage of the victim's weakness." Id.  There is no proof here that either of the two defendants sought in the fraud case to "take advantage" of the plaintiffs poor financial status or that either of them used that status in some way to facilitate the commission of the crime charged in Count Three.  Put simply and in the words of Zats, there was no nexus between the scheme that was charged in Count Three and the vulnerability or susceptibility that is identified in the PSI.  This Court should therefore sustain our objection to ¶ 86 of the PSI and in so doing find that the additional two-level increase that is based upon the number of class members in ¶ 87 is inapplicable as well.

      C.      The Defense Guidelines Calculations

The defense objections to the intended loss amount and vulnerable victim enhancements would result in an offense level that is twelve levels less than what is currently set forth in the PSI.  This, in turn, would translate into an adjusted offense level of 27 which would be the same adjusted offense level that applies to the two RICO offenses.  Accordingly, should the defense objections be upheld by the Court then the grouping rules set forth in U.S.S.G § 3D1.1, et seq. would come into play.  Under § 3D1.4(a), each individual group of offenses would count as one unit and because there are two groups of RICO offenses, three levels would have to be added to the adjusted offense level for the fraud offenses.  As a result of this calculation, the combined offense level applicable to this case would be 30 and the advisory sentencing range would be 97 to 121 months imprisonment.

      D.      The Court Should Grant A Downward Departure

As noted in ¶ 146 of the PSI, the Court is authorized to grant a downward departure from the guideline range if it finds that the offense level that applies to this case "substantially

overstates the seriousness of the offense." See U.S.S.G. § 2B1.1 application note 20(C). As stated in the application note itself, "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense " and that "[i]n such cases . . . a downward departure may be warranted." Id. Situations in which such "overstatement of the seriousness of the offense" exists include those in which the use of an intended loss theory to calculate the guideline range results in a dramatic increase in the offense level. United States v. Kushner, 305 F.3d 194, 199 (3d Cir. 2002) (noting that under predecessor version of § 2B1.1 'intended loss' can overstate or understate the seriousness of an offense just as much as 'actual loss'"). Other courts have applied in this context what has been coined the "economic reality" principle and it addresses situations in which the guideline range is based on an intended loss theory but the underlying scheme was unlikely to succeed. United States v. McBride, 362 F.3d 360, 376 (6th Cir. 2004) ("We conclude that the impossibility that McBride's scheme would succeed and the gross disparity between the actual loss and the intended loss demonstrate that there is a significant risk that 'the offense level determined under this guideline substantially overstates the seriousness of the offense'"). And lastly, in the Second Circuit a doctrine has evolved in which district courts have been authorized to depart downward in white-collar fraud cases where "an accumulation of somewhat overlapping enhancements, even if not amounting to double counting, can justify a downward departure." United States v. Jackson, 346 F.3d 22, 26 (2d Cir. 2003).

      The defense submits that the present case is an almost paradigmatic candidate for a downward departure under the authorities discussed above. As noted previously, there was no actual loss in this case because the scheme was unsuccessful and the plaintiffs' lawyers agreed to accept the $260,000 settlement amount after they learned that Mr. Hallinan could be joined as a

11

defendant in the Indiana lawsuit. Moreover, the same plaintiffs' lawyers and class representative agreed to accept in the Geneva Roth payday lending case a settlement which paid the members of that class less on a per loan basis than those lawyers and class representative agreed to accept in this case. Further, in both class actions the plaintiffs' lawyers acknowledged in their final-approval filings the possibility of holding individuals personally liable for any judgment that they could have obtained with the only difference being in the Geneva Roth case they chose to join the responsible individual as a defendant while in this case they made a tactical decision not to pursue that option. Thus, what the Court has before it is a situation in which the plaintiffs' lawyers were aware of Mr. Hallinan's status as a potential deep-pocket defendant, voluntarily chose not to join him as a party defendant in the class action, obtained more on per loan basis from him than they got in the Geneva Roth case and then convinced a judge that the settlement amount was fair, reasonable and adequate.[3]

Under these circumstances, there should be no serious issue concerning whether there was any actual loss suffered by anyone as a result of the fraud. The plaintiffs in this case got more than the plaintiffs got in the Geneva Roth payday loan class action and the same lawyers agreed to accept that amount after one of them admitted that he could have joined Mr. Hallinan as a defendant in the lawsuit but chose not to do so for tactical reasons. Yet notwithstanding these established facts, Mr. Neff's offense level was increased by twenty levels based upon an intended loss theory. Indeed, had the guideline range been calculated on the basis of actual

---

[3] The materials referred to above were used during the cross-examination of Vess Miller and the relevant pages are attached hereto for the Court's convenience. With respect to the amount of money per loan that was paid to the Indiana class members versus the amount paid per loan in the Geneva Roth case, pages nine through ten in the Apex 1 Processing final-approval memorandum fixes that number as $175.10 per loan in the Geneva Roth case versus the sum of $186.65 per loan in the Apex 1 Processing case.

as opposed to intended loss, the adjusted offense level would have been 19 and the advisory sentencing range for the fraud offense would have been 30 to 37 months imprisonment. The minimum term of imprisonment that applies in this case was thus increased by almost 20 years as a direct result of the use of an intended loss theory. Further, this case also shows how the application of multiple enhancements for closely-related specific-offense characteristics can dramatically increase the adjusted offense level. For example, Mr. Neff received a two-level enhancement in ¶ 84 of the PSI because "the offense involved ten or more victims" and then another two-level increase in ¶ 87 because a "large number" of those exact same victims were supposedly vulnerable. Further, a two-level increase was applied in ¶ 85 because "sophisticated means" were used to commit the offense which were largely the product of the "special skill" that Mr. Neff brought to the table as a lawyer thereby triggering another two-level enhancement under ¶ 88. While we recognize that each of these enhancements address different harms or individual factors and thus are not subject to attack for double-counting, the overlap is apparent and the effect of that overlap is very real and harsh.[4]

For all of these reasons and at the risk of being hyperbolic, the defense believes that this case literally cries out for a downward departure under application note 20(C) and the Second Circuit authority cited above. The intended loss calculation has increased the advisory minimum sentencing range by a factor of almost 20 years in a case where there was no actual loss and the victims of the scheme received more money per loan in their settlement than their counterparts received in comparable payday lending class action that was brought by the same

---

[4] If the two overlapping enhancements discussed above were not applied then the adjusted offense level would be 35 and the advisory sentencing range would be 168 to 210 months imprisonment. These two enhancements have thus added 94 months or almost eight years to the minimum term of imprisonment that is recommended by the guidelines.

lawyers and class representative. Further, several overlapping offense-level increases have also ratcheted-up the sentencing range to a point where years have been added to the minimum term that applies in this case. These arguments, moreover, would be just as valid if the Court upholds our objection to the intended loss calculation. While the disparity would not be as pronounced if the intended loss figure advocated here is used, the minimum range would still be 97 months imprisonment versus a minimum range of 30 months for a difference of 67 months. And finally, there would still be an overlap between the specific-offense enhancements although the extent of that overlap would depend upon whether our objections to the vulnerable victim enhancements are sustained. At any rate and notwithstanding which of the competing intended loss figures the Court decides to apply, a downward departure is plainly warranted in this case.

      E.      The Court Should Grant A Downward Variance

The question of whether a variance should be granted in this case requires an analysis of the sentencing factors which are listed in 18 U.S.C. § 3553(a). United States v. Tomko, 562 F.3d 558, 571 (3d Cir. 2009) (en banc) (upholding a variance because "[a]t Tomko's sentencing hearing, the district court explicitly examined subsections (a)(1), (a)(2)(A), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(3), (a)(4), and (a)(6) of § 3553"). Generally speaking, those factors focus on issues such as the offense conduct and the defendant's background and history, the seriousness of the crime and the need to promote respect for the law, principles of general and specific deterrence, the needs of the defendant and available sentences, the applicable sentencing guideline range, the need to avoid unwarranted sentencing disparities for similarly situated defendants, and the need to provide restitution for the offense. See 18 U.S.C. § 3553(a)(1)-(7). While these factors are important and require close attention, they are subject to an "overarching instruction" that the sentence imposed be "no greater than necessary" to achieve the often competing goals that must

be accommodated through the penalty that is selected.  <u>Kimbrough v. United States</u>, 552 U.S. 85, 111 (2007).

The probation officer has already addressed many of these issues in ¶ 148 of the PSI which reads as follows:

> The defendant's participation in the instant offense occurred over a period of years, but he has apparently lived an otherwise law-abiding lifestyle.  In addition, the defendant is approaching 70 years of age, he has voluntarily suspended his law license, and he had plans to retire from practicing law.  Therefore, deterrence may have already been realized in this case.  Finally, given the defendant's age, a guideline sentence, which would effectively result in a life sentence, may be greater than necessary.  Although the Sentencing Guidelines do not provide for consideration of situations like these, the Court may leverage these issues with the factors set forth in 18 U.S.C. § 3553(a).

The Court also has before it what are now 88 letters of support that have been submitted by a virtual gamut of community members which range from clergymen, judges, lawyers, a police officer, relatives and family friends most of whom have known Mr. Neff for decades and all of whom have attested to his good character and the aberrational nature of the actions which put him in this predicament.  In short, the man who will appear before this Court for sentencing has community support the likes of which undersigned counsel has not seen in 30 years of practice.

For what it's worth, the defense does not envy the Court in this case because it will be called upon to make a decision in which almost every one of competing considerations that go into the selection of a just and appropriate a sentence are implicated.  On the one hand, the crimes of which Mr. Neff stands convicted are very serious and to make matters worse were committed by a lawyer who has a higher obligation to respect and follow the law by virtue of his chosen profession.  Yet on the other hand those crimes were non-violent and resulted in no actual loss to the victims of the offense.  Similarly, the Court is required to impose a sentence that will deter other lawyers who may be thinking about abusing the civil justice system for the benefit of

a wealthy client while at the same time recognizing that what this defendant did is not something that is so heinous that he deserves to die in federal prison.  The Court must also tailor its sentence in such a way that unwarranted disparities are avoided which brings into play the seven-year term that was given to the much younger Timothy Muir who was the lawyer that was convicted along with Scott Tucker in the Southern District of New York for his involvement in the same general sort of fraud and racketeering schemes.  This is not therefore an easy case and deciding precisely what the appropriate punishment should be in light of all of these facts and considerations would quite frankly tax the wisdom of Solomon.  With that said, in our view a sentence of 60 months imprisonment or perhaps less would accomplish every goal for which punishment is imposed in a criminal case.  Coupled with the substantial forfeiture judgment that will be entered at the end of the hearing, a sentence in this neighborhood will put Mr. Neff in a prison for years while at the same time divesting him of the legal fees that he was paid by his client to commit the acts which led to his convictions.  That is enough to punish him for his crimes and to make clear for all to see that if you cross the line you will be held accountable for your actions and forever regret the poor decisions that you made.

III.  CONCLUSION

      For the reasons set forth above, defendant Wheeler Neff requests the Court to impose a sentence of 60 months imprisonment or less.

Respectfully submitted,

Date:  4/12/18      /s/Christopher D. Warren
Christopher D. Warren
171 Arch Street
Suite 3640
Philadelphia, PA 19103
(215) 200-9545

CERTIFICATE OF SERVICE

I, Christopher D. Warren, hereby certify that on this 12th day of April, 2018, I caused a true and correct copy of the foregoing Defendant's Amended Sentencing Memorandum to be served upon the following persons by electronic transmission:

Mark B. Dubnoff, AUSA
James A. Petkun, AUSA
Maria M. Carillo, AUSA
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

George H. McGary,
Senior United States Probation Officer
600 Arch Street
Suite 2400
Philadelphia, PA 19106

/s/Christopher D. Warren
Christopher D. Warren