## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 16-130-02 |
| WHEELER K. NEFF | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Wheeler K. Neff used his law license to help clients prey on the financial desperation of hundreds of thousands of people across the country, and he has shown no remorse for his crimes.  As proven at trial, Neff spent nearly a decade helping payday lenders like Charles M. Hallinan and Adrian Rubin evade state usury laws so they could collect hundreds of millions of dollars in payments on loans that had interest rates exceeding 780 percent.  Among other things, Neff drafted sham contracts designed to give the false impression that Hallinan and Rubin's companies were owned by Indian tribes that could claim "sovereign immunity" from laws they did not like.  Neff drafted these contacts to help clients collect unlawful debt for as long as possible without getting caught.  In return, Neff received hundreds of thousands of dollars a year in legal fees.

Neff also helped Hallinan defraud nearly 1,400 people who had brought a class action lawsuit in Indiana against one of Hallinan's companies called Apex 1 Processing, Inc. ("Apex 1").  Fearing that Hallinan could face personal exposure of $8 to $10 million if the plaintiffs could prove that he Apex 1, Neff conspired with Hallinan to make it appear that Apex 1 had no assets, employees, or officers, and was owned by an Indian chief living in Canada in order to entice the plaintiffs to accept a discounted settlement on their claims.  To further this

1

scheme, Neff told Hallinan to change tax returns and retroactively transfer business activity from Apex 1 to another of Hallinan's companies.  Neff also directed people to transfer all documents relating to Apex 1 to tribal lands in Canada, where they would never be found by the plaintiffs.

During the trial, Neff tried to deceive the jury.  Over four days of testimony, Neff told one lie after another under oath.  The jury, however, saw through Neff's perjury and convicted him of all eight charges against him: two counts of conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act ("RICO"); one count of conspiracy to commit mail and wire fraud; two counts of mail fraud and aiding and abetting; and three counts of wire fraud and aiding and abetting.  The Presentence Investigation Report ("PSR") has determined that Neff has a total offense level of 39, a criminal history category of I, a sentencing range of 262-327 months' imprisonment, and a fine range of $25,000 to $250,000 under the United States Sentencing Guidelines.  The government agrees with these calculations.

The government also submits that Neff should receive a substantially lengthier prison sentence than Timothy Muir, the former attorney for payday lender Scott Tucker who was recently convicted with Tucker in the Southern District of New York.  The judge in that case sentenced Muir to 84 months' imprisonment, and there are some similarities between Neff and Muir.  Both men helped payday lending clients evade state usury laws by hiding behind Indian tribes.  Both men also testified in their trials and both men testified falsely.  Neff, however, had more payday lending clients than Muir.  Neff also played an instrumental role in the execution of a $10-million fraud.  Neff also has demonstrated no remorse for his crimes and no sympathy for his victims.  Accordingly, a prison sentence within, or at least close to, the Guidelines range would best serve the factors set forth in 18 U.S.C. § 3553(a).  Neff also should be ordered to pay the within-Guidelines range fine of $250,000.

# I.    STATEMENT OF THE CASE

## A.    Procedural History

On December 1, 2016, a federal grand jury sitting in the Eastern District of Pennsylvania returned a 17-count superseding indictment against Hallinan, Neff, and Ginger. The indictment charged Hallinan and Neff with two counts of conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d) (Counts 1 and 2); charged all three defendants with one count of conspiracy to commit mail fraud, wire fraud, and money laundering, in violation of 18 U.S.C. § 371 (Count 3), two counts of mail fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1341 and 2 (Counts 4 and 5), and three counts of wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 6, 7, and 8); and charged Hallinan and Ginger with nine counts of international money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2 (Counts 9 through 17).

Count 1 alleged that Hallinan and Neff conspired to collect unlawful debt through the "Hallinan Payday Loan Organization," which included numerous business entities that Hallinan owned, operated, controlled, and financed out of offices located at 3 Bala Plaza, in Bala Cynwyd, Pennsylvania.  Count 2 alleged that Hallinan and Neff agreed collect unlawful debt through the "Rubin Payday Lending Organization," which included companies owned, operated, controlled, and financed by Rubin, a Pennsylvania resident, who had pleaded guilty to RICO conspiracy and other charges in a separate case (docketed at Crim. No. 15-238).  Counts 3 through 8 alleged that Hallinan, Neff, and Ginger conspired to defraud and did defraud the plaintiffs who had sued Apex 1 into believing that the company had no assets or employees so they would accept a discounted settlement of their claims.  Counts 9 through 17 alleged that Hallinan made nine monthly payments of $10,000 to Ginger so that Ginger would falsely claim

3

he owned Apex 1 instead of Hallinan.  The indictment contained three notices of forfeiture, which collectively sought to forfeit more than $490,000,000 in criminal property and proceeds.

Hallinan and Neff proceeded to trial, while Ginger remained beyond the Court's jurisdiction in Canada.  The trial began on September 26, 2017, and continued until November 27, 2017, when a jury convicted both defendants of all counts: Hallinan on Counts 1 through 17 and Neff on Counts 1 through 8.  On December 4, 2017, the government filed a motion for a preliminary order of forfeiture which, among other things, sought to forfeit the legal fees that Neff had received from Hallinan and Rubin as well as Neff's home in Delaware.  On March 30, 2018, the Court entered an order of forfeiture, which it modified on April 4, 2018.  Collectively, the orders provide that the government is entitled to forfeit $356,032.75 as Neff's proceeds from the RICO enterprises charged in Counts 1 and 2, as well as Neff's interest in 12.11% of his Wilmington, Delaware, residence.

**B.**     **Statement of Facts**

**1.**     **General Overview of Payday Lending**

Payday loans are short-term loans of small amounts, usually a few hundred dollars, which borrowers promise to repay out of their next paycheck or regular income payment, such as a social security check.  The loans usually have a fixed-dollar fee of approximately $30 for every $100 borrowed, instead of a traditional interest rate.  Thus, a borrower who obtains a $300 payday loan might have to pay a fee of $90 in order to get the loan.  Such a fee often translates to a high annual percentage rate of interest ("APR"), given the short-term nature of these loans.  For example, a $300 payday loan with a $90 fee that must be paid back within two weeks has an APR of just more than 780 percent.

Often, the borrowers are unable to repay the payday loans when they first come due.  When this happens, the borrower can pay a new fee and roll over the loan until the next pay period.  This process can continue multiple times until the loan is ultimately repaid.  The loans do not amortize, so these new fee payments do not reduce the principal owed.  For example, a person who borrows $300 for two weeks in exchange for a $90 fee and rolls over the loan three times will wind up paying $360 in fees and still owe the original $300 in principal.  One of the trial witnesses, Michael Kevitch, testified that that he oversaw Hallinan's payday lending operations for years, and the loans typically rolled over five times before any principal payments were made.

More than a dozen states, including Pennsylvania, effectively prohibit payday lending through criminal usury laws and other statutes that cap the annual interest rates that can be charged on consumer loans at 36 percent or less (the "Prohibited Payday Lending States").  Many other states permit some payday lending but have enacted complex regulatory schemes that involve licensing requirements for the lenders and usually impose some limits on the size of the loans, the number of permitted loan renewals or rollovers, and the interest rates (the "Regulated Payday Lending States").  Only about six states permit unlicensed payday lending to their residents.  At the trial, James Keiser from the Pennsylvania Department of Banking testified that in Pennsylvania, the maximum interest rate permissible on most personal loans of less than $50,000 was 6 percent per year.  An exception existed for lenders licensed with the Pennsylvania Department of Banking, as those lenders could charge up to approximately 24 percent annual interest on loans of up to $25,000.  Pennsylvania's RICO statute also makes it a crime for an enterprise to collect interest, fees, and other charges from a loan in excess of 25 percent per year.

## 2.     The Hallinan Payday Lending Enterprise (Count 1)

### (a)     General Overview

Hallinan, who has residences in Villanova, PA, and Boca Raton, FL, was in the payday lending business from at least 1997 until at least 2013.  Throughout that time period, Hallinan owned, operated, controlled and financed numerous business entities that issued, serviced, funded, and collected debt from payday loans (the "Hallinan Payday Loan Companies").  Most of those entities operated out of offices Hallinan rented in Bala Cynwyd, PA.  The Hallinan Payday Loan Companies included, but were not limited to, the following entities, each of which issued, serviced, and/or collected debt from payday loans:

- TC Services Corp., d/b/a "Telecash" and "Tele-Ca$h" and formerly known as "Tele-Ca$h" and "RAC" ("TC Services");
- CRA Services, d/b/a "Cashnet" ("CRA Services");
- Main Street Services Corp., d/b/a "Easy Cash" ("Main Street");
- Tahoe Financial Advisors, d/b/a "Axcess Cash" ("Tahoe");
- National Money Service, Inc., a/k/a "NMS, Inc.," which did business under multiple trade names ("NMS");
- First East, Inc., d/b/a "Xtra Cash," "Fast Funding First East," and "Payday Loan Direct" ("First East");
- Cheyenne Servicing Corp. ("Cheyenne");
- CR Services Corp. ("CR Services");
- Apex 1 Processing, Inc., d/b/a "Paycheck Today," "Cash Advance Network," and "Instant Cash USA" ("Apex 1 Processing");
- Cash Advance Network, Inc. ("CANI");
- Instant Cash, USA, Inc. ("ICU");
- Fifth Avenue Financial, Inc., d/b/a "My Next Paycheck" ("Fifth Avenue");
- Palmetto Financial, Inc., d/b/a "My Payday Advance" ("Palmetto");
- Sabal Financial, Inc., d/b/a "Your Fast Payday" ("Sabal");
- Tribal Lending Enterprises, Division A ("TLE-A");
- Micro Loan Management, Division A ("MLM-A");
- Sequoia Tribal Enterprises ("STE"); and
- Sequoia Tribal Management Services ("STMS").

The Hallinan Payday Loan Companies also included the following entities that provided money for payday loans and received proceeds from the collection of debt arising from payday loans:

- HL Funding, Inc. ("HL Funding");
- HL Services, Inc. ("HL Services");
- Blue Water Management Services, LLC ("Blue Water Management");
- Blue Water Funding Group ("Blue Water Funding");
- Hallinan Capital Corp. ("HCC"); and
- Mill Realty Management, LLC ("Mill Realty").

Other Hallinan Payday Loan Companies were Apex 1 Lead Generators ("Apex 1 LG"), which helped identify payday loan customers, and Clarity Services, Inc. ("Clarity"), which operated as a credit bureau for those potential customers.  Initially, Hallinan's companies communicated with customers by telephone and fax before switching to the internet at some point in the late 1990s.  In many cases, Hallinan had business partners in the payday lending business, one of whom was Adrian Rubin.[1]

   *(b)*    ***The Rent-A-Bank Years***

From the outset, Hallinan knew that he could not lawfully issue payday loans to customers in all 50 states because of some states' anti-usury laws and other restrictions on payday lending in many states where borrowers lived.  However, Hallinan also was aware of a federal statute that permitted federally-insured banks to "export" the permitted interest rates of the states in which the banks were incorporated when lending to borrowers across the country. What this meant is that a federal bank that was incorporated in a state like Delaware, which did not have anti-usury laws or interest rate caps, could make payday loans to borrowers who lived

---

[1] Hallinan's other payday lending partners included Scott Tucker, who was convicted of RICO and other charges in the Southern District of New York, as well as Kevitch, Tom Assenzio, William Carlson, Gary Gordon, Richard Mickman, Stan Myerson, and David Wiggins.  Hallinan wound up in litigation with many of those former business partners.

in states where there were anti-usury laws or interest rate caps.  In the late 1990s, Hallinan and several of his business partners, including Rubin, tried to take advantage of this law by effectively hiring County Bank of Rehoboth, Delaware ("County Bank") to act as a false front for their payday lending companies.

Attorney Leonard S. Goodman drafted a series of contracts that were designed to give the appearance that County Bank would be issuing payday loans to borrowers across the country, and that the Hallinan Payday Loan Companies would be only "servicing" those loans: i.e., handling customer relations, inputting data, and overseeing the mechanics of distributing the funds and collecting repayments.  In reality, however, the Hallinan Payday Loan Companies provided nearly all of the funds for the payday loans, controlled the loan approval process, oversaw debt collection efforts, and received nearly all of the revenues from the loans.  The bank's role was effectively limited to having its name listed on the loan documents to further the appearance that it was the actual lender.  The Hallinan Payday Loan Companies paid County Bank for the use of its name.  The practice of a payday lender paying a bank to act as a front for the payday lending enterprise in order to evade state anti-usury laws was referred to by payday lending industry insiders as "rent-a-bank."  From approximately 1997 through 2003, the Hallinan Payday Loan Companies effectively "rented" County Bank.

The New York Attorney General's Office saw through the façade and filed a lawsuit in September 2003 against County Bank, TC Services and CRA Services, for violating New York anti-usury laws.  Although the lawsuit took years to resolve – ending with the defendants paying approximately a $5.5 settlement – the lawsuit's filing precipitated the end of the rent-a-bank era.  By December 31, 2003, County Bank had stopped doing business with any of the Hallinan Payday Loan Companies.

(c)     **The Rent-A-Tribe Years**

In early 2004, Hallinan continued to make payday loans to borrowers across the country without any arguable form of legal protection.  Then, he concocted a new scheme to hide his usurious loans from government interference: Hallinan and Tucker paid Indian tribes to pretend that they owned his payday lending companies.  That way, whenever a state tried to enforce its laws against a payday lending company, the tribe would claim that it had "sovereign immunity" from the enforcement of such laws.  In reality, the Indian tribes had very little connection to the day-to-day operations of the payday lending operations.  Typically, the tribes did not provide the money advanced for the payday loans, service the loans, collect on the loans, or incur any losses if the borrowers defaulted.  Those functions were conducted solely by non-tribal payday lenders, such as defendant Hallinan and the Hallinan Payday Loan Companies.  The tribes' sole function was to act as false fronts for the Hallinan Payday Loan Companies and assert "sovereign immunity" whenever necessary to evade the laws of the Prohibited Payday Lending States and the Regulated Payday Lending States.  This model was widely characterized throughout the payday lending industry as "rent-a-tribe."

Between 2003 and 2013, Hallinan entered into multiple partnerships with Indian tribes, pursuant to which Hallinan paid the tribes large monthly fees to act as false fronts for his payday lending companies.  The first such tribe was the Modoc tribe of Miami, Oklahoma.  From approximately 2004 until 2008, Hallinan paid the Modoc tribe monthly fees to pretend that the tribe, through an entity called MTE Financial Enterprises, issued payday loans that were actually funded, serviced, and collected upon by various Hallinan Payday Loan Companies.  In 2008, Hallinan, aided by Neff, purported to transfer his payday lending operations from the Modoc tribe to Ginger, a Canadian citizen who claimed to be a "hereditary chief" of the

Mowachaht/Muchalaht First Nation based near Vancouver, Canada.  From late 2008 until at least 2013, Hallinan paid Ginger thousands of dollars each month to pretend that Ginger's tribe issued payday loans, which were actually funded, serviced, and collected upon by various Hallinan Payday Loan Companies.  In 2011, Hallinan, aided by Neff, purported to transfer most of his payday lending operations from Ginger's tribe to the Guidiville Band of Pomo Indians of the Guidiville Rancheria ("Guidiville"), a tribe based near Ukiah, California.  From approximately 2011 until approximately 2013, Hallinan paid Guidiville at least $20,000 a month to pretend that it issued payday loans that were actually funded, serviced, and collected upon by various Hallinan Payday Loan Companies.

Neff's involvement in Hallinan's rent-a-tribe scheme began in earnest in 2008. Shortly after Hallinan founded Apex 1 in July 2008, Neff drafted contracts to make it look like Hallinan was selling Apex 1 to a company called Aboriginal GR Financial, a sole proprietorship owned by Ginger.  Neff drafted a series of sham contracts, including: (1) a stock purchase agreement that purported to memorialize Hallinan's sale of Apex 1 to Ginger's company for $10,000; (2) an employment agreement in which Hallinan purportedly would become a "vice president" of Apex 1 and earn a $120,000 annual salary; (3) a servicing agreement; and (4) a $5 million commercial loan note.  All of these documents, purportedly signed in November 2008, were just for show.  As Neff knew, neither Hallinan nor Ginger ever intended for Ginger to run any payday lending companies.  Hallinan just wanted a tribal front for his payday lending activity so that if any person or state tried so sue him or shut him down, he could claim "tribal sovereign immunity."  Ginger just wanted money.  Neff's bogus contracts gave both men what they wanted, and Neff got what he wanted: legal fees from Hallinan.

A couple of months later, Neff drafted a stock purchase option agreement, which effectively negated the stock purchase agreement by giving Hallinan an option to buy back Apex 1's loan portfolio at any time.  This was another sham contract.  Ginger never paid Hallinan any money for Apex 1, and Hallinan never gave Ginger any access to any of Apex 1's assets.  In fact, from 2008 until the middle of 2013, Ginger had absolutely nothing to do with Apex 1.  Hallinan ran the company out of Bala Cynwyd under the portfolio names: Paycheck Today ("PCT"), Instant Cash USA ("ICU"), and Cash Advance Network ("CAN").

In 2009, Neff created three new companies in Ginger's name: Fifth Avenue Financial, Inc., d/b/a "My Next Paycheck" ("MNP"), Palmetto Financial, Inc., d/b/a "My Payday Advance" ("MPA"), and Sabal Financial, Inc., d/b/a "Your Fast Payday" ("YFP").  MNP ultimately took over the PCT portfolio; MPA took over the CAN portfolio; and YFP took over the ICU portfolio.  Neff represented to the IRS that Ginger owned all of these companies, but in reality, Ginger never had anything to do with any of them.  Hallinan financed and ran all three companies out of his offices in Bala Cynwyd.  Ginger's claimed ownership in these entities was, as Neff liked to say, just for "optics."

In October 2010, the Pennsylvania Supreme Court published a ruling that Pennsylvania could apply its banking laws, including interest rate caps, to out-of-state payday lenders that made loans over the Internet to people living in Pennsylvania.  Neff responded to this decision by taking steps to transfer Hallinan's payday lending activity from Ginger – a single person living in Canada who claimed to be an Indian chief – to a federally-recognized, United States-based Indian tribe.  That tribe wound up being the Guidiville Band of Pomo Indians of the Guidiville Rancheria ("Guidiville"), a tribe based near Ukiah, California.  To facilitate the new relationship, Neff drafted a more elaborate series of sham contracts that were designed to create

an appearance that Guidiville owned Hallinan's payday lending companies.  Additionally, after the tribe passed an ordinance setting a 36-percent rate cap on all payday loans, Neff demanded that the tribe rescind the ordinance if it wanted to do business with Hallinan.

On May 11, 2001, Hallinan and a tribal representative named Michael Derry signed the bogus contracts that Neff had drafted.  All of them were designed to create an illusion that Guidiville, not Hallinan, owned and operated Hallinan's payday loan companies.  The entire arrangement was – as Hallinan would later admit to Rubin on tape – a "farce" and a "sham." Hallinan continued to own and control every facet of the payday lending companies, as Neff knew he would.  Although Hallinan sent a computer server to the tribe in California, Guidiville did nothing more than place the server in a shed and turn the power on; no payday lending decisions were ever made on tribal land.  Guidiville Band of Pomo Indians of the Guidiville Rancheria ("Guidiville"), a tribe based near Ukiah, California.  From approximately 2011 until approximately 2013, Hallinan paid Guidiville at least $20,000 a month to pretend that it issued payday loans that were actually funded, serviced, and collected upon by various Hallinan Payday Loan Companies that operated under names such as TLE-A, MLM-A, STE, and STMS.

*(d)     Summary*

The evidence at trial proved that between 2007 and 2013, the Hallinan Payday Loan Companies extended more than $422 million in payday loans to customers through a third-party processing company called Intercept EFT.  Bryan Smith, the CEO of Intercept, testified that his company had determined that the average size of each payday loan was about $300, which means that there were approximately 1.4 million people who took out payday loans from the Hallinan companies during the charged conspiracy.  Smith also testified that the Hallinan Payday Loan Companies directed Intercept to collect approximately $688 million of payday loan

debt, and Intercept was able to recover approximately $490 million of that debt, including from borrowers who lived in Prohibited Payday Lending States or Regulated Payday Lending States. Neff used his law license to facilitate nearly all of this criminal conduct.

### 3.       The Rubin Payday Lending Enterprise (Count 2)

In addition to helping the Hallinan Payday Lending Enterprise collect unlawful debt, Neff also agreed to help Rubin issue and collect unlawful debt from payday loans made to borrowers in the Prohibited Payday Lending States and the Regulated Payday Lending States. Rubin had been one of Hallinan's earliest business partners in the payday lending industry.  In or about 1998, Hallinan, Rubin, and Rick Mickman formed CRA Services, although Hallinan and Rubin soon bought out Mickman's interest in the company.  From about 1998 until about 2002, Hallinan and Rubin paid County Bank to act as a false front for CRA Services' payday lending operations.

In or around late 2002, Hallinan introduced Rubin to Neff, who advised Rubin to relocate his payday lending operations to one of three states that Neff characterized as "usury friendly" – Utah, Delaware, and New Mexico – which meant that they permitted payday lenders registered in those states to issue loans to customers across the county.  Rubin followed Neff's advice and incorporated Global Pay Day Loan ("Global") in Utah.[2]  From about 2004 until 2006, Rubin directed Global to issue and collect on payday loans made to borrowers across the country.  Rubin's conduct was noticed by some state agencies, including the Kansas Attorney General's Office, which sent him a complaint.  Rubin referred the matter to Neff, who helped Rubin settle the dispute.

---

[2] Rubin testified that he briefly also operated another payday loan company in Delaware called "abcpaydayloan," first without a license and then temporarily with a license.

In November 2006, Rubin incorporated First National Services, LLC ("FNS") in Delaware.  This time, Rubin did not even try to give the impression that his business was legal. He did not get a lender's license anywhere and instead just made payday loans to borrowers across the country, regardless of where they lived.  To protect himself, and to hide the fact that he had a criminal record, Rubin registered FNS under the name of a close family friend, V.V. From approximately 2007 through 2011, FNS issued, serviced, and collected debt from payday loans that had been extended to customers across the country, including people who lived in the Prohibited Payday Loan States and the Regulated Payday Loan States.  At the same time, Rubin introduced his sons, Blake and Chase Rubin, into the payday lending business.

At some point in the mid-2000s, Rubin learned of the "rent-a-tribe" model that Hallinan and other payday lenders were using to make payday loans to customers in the Prohibited Payday Loan States and the Regulated Payday Loan States.  Rubin wanted to enter into a similar arrangement with an Indian tribe, but he did not have any contacts at any tribes. Rubin repeatedly asked Hallinan to introduce him to Hallinan's tribal contacts, but Hallinan refused to do so.  However, in late 2010 or early 2011, Neff told Rubin that Hallinan was transitioning from Ginger's Canadian-based tribe to the Guidiville tribe in California and would introduce Rubin to the Guidiville tribe in return for a fee.  Rubin contacted Hallinan, and they worked out a deal, pursuant to which Rubin and his sons would pay $100,000 to Hallinan in return for Hallinan's agreement to let the Rubins "rent" the Guidiville tribe's sovereign immunity.

Neff then drafted a series of contracts between FNS and Guidiville-affiliates Tribal Business Ventures ("TBV") and Tribal Business Management ("TBM"), which were designed to make it appear that those entities owned and operated the Rubins' payday lending

14

companies.  These were the same series of sham contracts that Neff had drafted for Hallinan and Guidiville.  Some of the contracts purported to effectuate a transfer of FNS's entire loan portfolio and lending infrastructure to Guidiville and its affiliated entities.  Other contracts, however, undermined that supposed transfer, and collectively, the agreements, most of which were dated November 10, 2011, had the effect of nullifying each other.  While some contracts gave the appearance that FNS was selling its entire payday lending operation to the Tribe, others made it clear that FNS was providing all the funds for the loans, providing all the employees to service the loans, and incurring all of the risks of defaulting on the loans.  The only role of the Tribe, through TBV and TBM, was to give the appearance that it owned and operated the payday lending organization and assert "sovereign immunity" if anyone complained that the loans violated state laws.  In return, FNS agreed to pay the Tribe, through its affiliates, a monthly commission equal to $20,000 or 1 percent of gross revenues minus bad debt from the payday loans, whichever was greater.  FNS also agreed to indemnify the Tribe for any legal expenses it incurred in connection with the business.

      None of these contracts mattered because like Hallinan, Rubin never gave Guidiville access to any aspect of his payday lending enterprise: not the loan portfolio, not the bank accounts, not anything.  Neff knew Rubin would remain in control of the companies when he drafted the contracts, but he did not care because Rubin was his client, and Rubin was paying Neff's bills.  Adding to the overall farce was the fact that Rubin's name appeared nowhere on any of the contracts.  Neff drafted the contracts as if V.V. would be the person to sign them on behalf of FNS, even though as Neff admitted at trial, he had never met or spoken with V.V.

      From approximately January 1, 2012, through March 31, 2012, TBV pretended to issue payday loans that were actually funded, serviced, and collected upon by Adrian Rubin and

his two sons, Blake Rubin and Chase Rubin.  Many of the loan customers lived in Prohibited

Payday Loan States and Regulated Payday Loan States.  Rubin and his sons also paid Hallinan a

total of $100,000 for his help in their renting of the Guidiville tribe to help in their collection of

unlawful debt arising from payday lending.  Neff was paid in legal fees.

### 4.    The Fraud Involving Apex 1 (Counts 3 through 8)

As stated above, one of the Hallinan Payday Loan Companies was Apex 1, which

did business as PCT, CAN, and ICU.  Hallinan founded Apex 1 in 2008 and listed his Boca

Raton condominium as the company's business address. For the next five years, Hallinan

repeatedly represented to the world that he was the owner and principal of Apex 1, including on

numerous tax forms filed with the IRS; on annual reports and other corporate filings with

governmental agencies; on bank account applications; and on contracts with third-party vendors

such as Intercept EFT.  Hallinan also operated Apex 1 Processing out of his office suite in Bala

Cynwyd, Pennsylvania.

In November 2008, Hallinan signed the phony contracts Neff had drafted that

were designed to create a false impression that Hallinan was selling Apex 1 to Aboriginal GR

Financial.  In December 2008, however, Hallinan signed several new contracts with Intercept as

the 100 percent owner and president of Apex 1.  Hallinan also opened three new bank accounts

for Apex 1 at PNC Bank, and with each account, Hallinan again represented that he was the

president of Apex 1.  Hallinan opened other bank and investment accounts for Apex 1 and made

sure that all statements and bank records for each account were addressed to his offices in Bala

Cynwyd.  Ginger signed no documents on behalf of Apex 1 and received no bank statements or

mailings from Intercept.  Hallinan also signed about a dozen tax forms under oath in which he

attested to the IRS that he was the 100 percent owner of Apex 1.

From approximately December 2008 until at least May 2011, Apex 1 Processing issued, serviced, and collected debt from payday loans that were extended to borrowers living all over the United States, including in states where such lending was either prohibited or regulated. One of those states was Indiana.  On March 23, 2010, a class action lawsuit was filed in Indiana state court against Apex 1 Processing, Inc., d/b/a Paycheck Today a/k/a Paychecktoday.com (the "Indiana Lawsuit").  The Indiana Lawsuit alleged that Apex 1 Processing had violated the Indiana Consumer Credit Code's Small Loans Act and the Indiana Deceptive Consumer Sales Act by issuing payday loans with outrageous finance charges to Indiana residents.

In or around May 2010, Hallinan hired Susan Verbonitz, an attorney at Weir & Partners, LLP ("Weir"), in Philadelphia, to lead Apex 1 Processing's defense.  More precisely, Neff called Verbonitz and hired her to lead Apex 1's defense.  Neff told Verbonitz that he was calling on behalf of Hallinan – not Ginger or any claimed representative of Ginger.  For approximately three years, Verbonitz vigorously fought to have the case thrown out.  She moved to compel arbitration and dismiss the lawsuit.  When that failed, she appealed, and when that appeal was denied, she sought review from the Indiana Supreme Court and even the United States Supreme Court.  Verbonitz's actions succeeded in stalling the litigation and causing the plaintiffs' lawyers to spin their wheels as they racked up thousands of dollars in unreimbursed expenses.  Verbonitz testified at trial that throughout this time period, Hallinan was her client contact at Apex 1; Hallinan was the person who authorized all of her dilatory tactics; and Hallinan was the person who paid all of her legal bills.  Verbonitz testified that she never took direction from Ginger or anyone else on his behalf, such as Robert Banno.  In fact, she never spoke with Ginger.  Her contacts at Apex 1 were only Hallinan and Neff.

Eventually, Verbonitz ran out of appeals, and on May 8, 2013, the Indiana trial court certified the class of plaintiffs, which consisted of 1,393 former customers of Apex 1 Processing in Indiana.  Shortly thereafter, Verbonitz left the Apex 1 Processing defense team. According to Verbonitz, Hallinan and Neff had decided that they no longer wanted to defend the lawsuit and they directed her to "play a dead hand," which meant letting the plaintiffs get a default judgment against Apex 1 Processing and then try to collect on it by going after Ginger as the company's owner.  Verbonitz claims she told Hallinan and Neff she could not do that, so they told her they would fire her.

Before Verbonitz was terminated, Neff sent an email to Hallinan warning him that the Indiana Lawsuit was "potentially dangerous" and that if the plaintiffs prevailed, Hallinan could face personal exposure of up to $10 million if the plaintiffs could establish that Hallinan had not actually sold Apex 1 Processing to Ginger.  In this email, dated July 12, 2013, Neff suggested that Hallinan contact his accountant for the purpose of submitting "corrected" tax returns to the IRS, which would indicate that Apex 1 Processing was owned by Ginger, not Hallinan.  Neff also advised Hallinan to "retroactively" transfer all business activity from Apex 1 Processing to one of the other Hallinan Payday Loan Companies in order to make it appear like Apex 1 Processing had very few assets with which it would be able to pay a settlement or judgment in the Indiana Lawsuit.  On July 16, 2013, Hallinan forwarded Neff's email to his accountant and directed the accountant's attention to Neff's advice about submitting "corrected" tax returns.

Hallinan also called Ginger and said, "Randy, look, we got a lawsuit in Indiana against us.  I'll pay you ten grand a month if you will step up to the plate and say that you were the owner of Apex One Processing and upon the successful completion of the lawsuit I give you

18

fifty grand."[3]  According to Hallinan, Ginger responded by asking, "When can I get the first wire?"  Hallinan told Ginger, "Well you have to talk to your lawyer who's an absolute expert in Canadian tribal law. … He has to agree to represent you, and then he's got to send letters to Weir and Partners and the local firm in Indiana, firing them. … Then you get your ten grand.  It didn't take a week."

On July 22, 2013, a Canadian attorney named Robert Banno sent a letter to Verbonitz in which he claimed to represent "Hereditary Chief Randall Ginger, and his wholly-owned entity, GR Financial."  Banno's letter stated that GR Financial was "the 100% owner of Apex 1 Processing" and that Apex 1 Processing was terminating their legal services agreement.  On July 26, 2013, Verbonitz filed a motion to withdraw as counsel.  A week later, on August 2, 2013, Neff sent an email to Ginger, advising him to send emails to Verbonitz, Hallinan, and Michael Kevitch, who had been the Chief Operations Officer for Apex 1 Processing, terminating each of their jobs with Apex 1 Processing.  Ginger followed Neff's advice and sent those termination emails.  On August 9, 2013, Hallinan directed one of his companies to wire $10,000 to a bank account for Aboriginal GR Financial in Canada.  Hallinan followed that up with additional $15,000 wire transmittals to bank accounts controlled by Ginger on September 11, 2013, October 1, 2013, November 1, 2013, December 2, 2013, January 2, 2014, February 3, 2014, March 3, 2014, and April 2, 2014.[4]

On September 24, 2013, Banno sent a letter directly to plaintiffs' counsel stating that he represented "Aboriginal GR Financial and its Hereditary Chief Randall Ginger."  Banno wrote that Apex 1 Processing: (1) "is not operational, no longer carries on business, and has not

---

[3] The quoted language is from a recorded conversation between Hallinan and Rubin on August 28, 2013.

[4] Hallinan already had been wiring Ginger $5,000 a month, so these payments represented transmittals of an additional $10,000 per month, just as Hallinan had promised.

done so for several years;" (2) "has few, if any, assets;" and (3) "has "no officers or employees and is overseen by Chief Ginger, carrying on business as Aboriginal GR Financial." A few weeks later, the Indiana trial court granted Verbonitz's motion to withdraw as counsel for Apex 1 Processing.

She was eventually replaced by Kenneth Dubrow, an attorney at The Chartwell Law Offices, LLP ("Chartwell"), in Philadelphia. Dubrow never entered an appearance in the Indiana case, but he represented Apex 1 Processing in settlement negotiations with the plaintiffs, and he also represented Hallinan at a deposition on February 5, 2014. Before Dubrow did any work, however, he wanted to know how he would get paid. Neff and Hallinan told Dubrow that he would have to send his bills to Banno in Canada. It was just another part of the façade, another method of creating a false appearance that Ginger and Banno were directing the litigation strategy, and another way to hide Hallinan's involvement in Apex 1 and the lawsuit. In Neff's words, it was about the "optics."

During Hallinan's deposition, Hallinan testified that Apex 1 Processing was out of business; that he had sold the company to Ginger in November 2008; that he initially agreed to be a vice president of Apex 1 Processing and earn a salary of $120,000; but that he did "very, very little" as the company's vice president. Hallinan also testified that he left Apex 1 Processing in or around February 2009, when he told Ginger: "Randy, you don't need me, I'm not performing any services. I'm spending my time in Florida, and I'm taking money under false pretenses, and I'd like to end the deal." Hallinan also testified that he did not employ Verbonitz to represent Apex 1 Processing in the Indiana Lawsuit and he did not know who was paying Apex 1 Processing's legal expenses.

Much of Hallinan's testimony was perjury.  Hallinan received millions of dollars in income from Apex 1 Processing after he supposedly "left the company" in February 2009, and although he delegated Michael Kevitch to oversee the day-to-day operations of the company, Hallinan always had the ultimate managerial control.  Additionally, Hallinan was Verbonitz's client contact at Apex 1 Processing throughout the Indiana Lawsuit and directed his companies to pay all of her legal fees.  Hallinan also directed his companies to pay all of Dubrow's legal bills, although he and Neff tried to hide Hallinan's role in these payments by instructing Dubrow to send those bills to Banno in Canada to make it appear like Ginger was directing Apex 1 Processing's litigation strategy; Banno then forwarded those bills to Hallinan in Pennsylvania, and Hallinan paid them.

The defendants' efforts to deceive the Indiana plaintiffs into believing that Apex 1 Processing was effectively judgment proof was successful.  In April 2014, the plaintiffs agreed to settle the lawsuit for approximately $260,000.  The lawyers for the Indiana Plaintiffs had valued the case at greater than $2.6 million, but they agreed to accept a discounted settlement offer soon after Hallinan's deposition because they did not think they could ever prove their case against Hallinan.  They saw the dishonest lengths that Hallinan and Dubrow were willing to go to at Hallinan's deposition.  They saw the "strange" and "wacky" letters that Banno, a lawyer from a high-priced international law firm, had written on behalf of Apex 1.  And they did not have access to Hallinan's tax records, Apex 1's bank records, or any of the other evidence the government later obtained, which proved Hallinan's continued ownership of and control over Apex 1.  So, they took what they could get and gave up.

5.     **Uncharged Crimes**

Neff testified that Hallinan and Rubin were not his only payday lending clients. He testified that he helped at least three other payday lenders (David Wiggins, Tom Assenzio, and Chad Miraglia) enter into contractual relationships with Guidiville, pursuant to which they made payday loans to people living across the country and collected debt from those borrowers. In the case of Wiggins, Neff testified that (a) he also drafted contracts between Wiggins and Ginger in 2006, pursuant to which Wiggins made payday loans and collected debt from such loans; and (b) he tried to help Wiggins get back into the payday lending industry in 2015.  Neff further testified that he received hundreds of thousands of dollars in legal fees from each of his payday lending clients, each of whom collected payday loan debt from people across the country.

Additionally, Hallinan's accountant, Rod Ermel, testified that he had not filed any tax returns for Apex 1, Sabal, Fifth Avenue, and Palmetto since 2013, even though all four companies would have been obligated by law to file such tax forms even if they had gone out of business.  Ermel testified that he also was told by one of Hallinan's lawyers to "stand by" with regard to filing amended returns for those companies.  Neff saw the 2013 tax returns that Ermel prepared in 2014, which would have identified Ginger as the owner of Apex 1 and the other companies.  Neff took no steps to "correct" the information on the Apex 1 return to state that the owner was either Hallinan or "Aboriginal GR Financial," – a representation that Neff knew would have cost Apex 1 its status as an S-Corp and subjected it to higher tax rates.

6.     **Neff's Perjury**

Neff testified for four days at the trial.  Among other things, Neff testified:

- That the July 12, 2013 email he sent to Hallinan, advising Hallinan to "correct" his tax returns regarding Apex 1 and "retroactively" transfer all

business activity from Apex 1 to another company was "garden-variety" legal advice of the sort he would give to any client;

- That the reason why he wrote an August 2, 2013, email to Ginger, directing Ginger to send termination emails to Hallinan, Verbonitz, and Kevitch and instructing them to box up and send all Apex 1 materials to tribal land in Canada was for the purpose of preserving the records and keeping them all in one place;

- That he believed in good faith that Hallinan payday lending activities were always legal, for reasons which included that:

  - Ginger "embodied" a Canadian tribe because he claimed to be a chief of that tribe;

  - Ginger and Guidiville were the true owners of Hallinan's payday lending companies; and that

  - All payday lending decisions were made on tribal lands.

The jury did not credit Neff's testimony, as demonstrated by both its verdict and the speed with which it delivered that verdict.  Indeed, the instances of Neff's outright perjury are staggering and too numerous to reiterate here.

## II.   SENTENCING CALCULATION

### A.   Statutory Maximum Sentences

Neff is facing the following maximum possible sentences: Counts One and Two, RICO conspiracy, 20 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment per count; Count Three, conspiracy, 5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment; Counts Four

and Five, mail fraud, 20 years' imprisonment, a 3-year period of supervised release, a $250,000

fine, and a $100 special assessment per count; Counts Six through Eight, wire fraud, 20 years'

imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special

assessment on each count.

In total, Neff is facing a maximum possible sentence of 145 years' imprisonment,

a 3-year period of supervised release, a $2 million fine, and an $800 special assessment.  Full

restitution also may be ordered.  Forfeiture may be ordered.

**B.** **Guidelines Calculation**

The government agrees with all the PSR's Guidelines calculations.  First, we

agree with the PSR's determination that Neff's crimes should be separated into three groups,

pursuant to U.S.S.G. § 3D1.2, one for each RICO conspiracy and one for the fraud charges.

For Group I, arising out of Count 1, the government also agrees that the base

offense level is 19, pursuant to U.S.S.G. § 2E1.1, and that there should be four two-level

enhancements: (1) under Section 3A1.1(b)(1), because the victims were vulnerable (i.e.,

financially desperate enough to resort to payday loans); (2) under Section 3A1.1(b)(2) because

there were a large number of vulnerable victims (approximately 1.4 million, according to

Smith's testimony); (3) under Section 3B1.3 because Neff used his special skill as an attorney to

facilitate the offense (i.e., by drafting the bogus contracts between Hallinan and the "tribal"

representatives); and (4) under Section 3C1.1 for obstruction of justice, based on Neff's perjury

at trial.  Thus, the adjusted offense level for Group 1 is 27, as correctly stated in the PSR.

The exact same analysis applies for Group II, which is based on Count 2.  Thus,

the adjusted offense level for that group is also 27.

24

For Group III, arising from the fraud and conspiracy convictions, the base offense level is 7, pursuant to U.S.S.G. § 2B1.1, because the mail and wire fraud convictions carry statutory maximum penalties of 20 years' imprisonment.  The PSR correctly applies a 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K), because the intended loss amount is greater than $9.5 million as demonstrated by Exhibit 400, which is the July 12, 2013 email in which Neff warned Hallinan the lawsuit could have a value of up to $10 million.  Neff objected to this enhancement on the grounds that it did not reflect his "subjective expectation of what would have happened if the scheme had been successful."  *See* PSR at p.36 (Objection No. 2).  Neff contended that since he wanted to extend a settlement offer of $40,000 to the plaintiffs' counsel, and the case actually settled for $260,000, the intended loss figure was only $220,000, so a ten-level enhancement under U.S.S.G. § 2B1.1(b)(1)(F) would be more appropriate.  The Probation Officer, however, properly rejected that argument.  Application Note 3 to Section 2B1.1 provides that the loss calculation is the greater of the actual loss and the intended loss, and that the intended loss means the pecuniary harm that was intended to result from the offense, even if it was impossible or unlikely to occur.  In this case, Neff's email to Hallinan (Exhibit 400) makes it clear that he understood the reasonable foreseeable pecuniary harm to be as much as $10 million. That figure, therefore, is the proper amount to apply in Section 2B1.1(b)(1), and a 20-level enhancement should apply.

The PSR also correctly applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A) because there were ten or more victims – 1,393 to be precise.  Additionally, the PSR correctly applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(10), because the crime involved sophisticated means.  As an alternate ground for this enhancement, a significant aspect of the fraud was committed from outside the United States – namely, the letters and

emails sent from Ginger and Banno in Canada, which were designed to create the false impression that Apex 1 had no assets, employees, or deep pocket American owners.  Either way, the enhancement applies.

The PSR also correctly applied two-level enhancements under U.S.S.G. § 3A1.1(b)(1) for vulnerable victims and U.S.S.G. § 3A1.1(b)(2), because the crime involved a large number of vulnerable victims. Neff objects to the vulnerable victims enhancements on the ground that the 1,393 members of the class were not vulnerable because they were represented by sophisticated plaintiffs' counsel.  The Probation Department did not accept or reject this objection and stated instead that "[t]he Court will decide the issue."  PSR at p.37 (Response to Objection No. 3).  The government respectfully submits the victims of the crimes described in Counts 3 through 8 were the members of the class, not their lawyers.  The 1,393 members of the class were the ultimate victims of Neff and Hallinan's fraud scheme.  The fact that only two members of that class made claims for payments is irrelevant, especially in light of the defense's dubious assertion that all records identifying the other 1,391 borrowers had been lost when Apex 1's computer server got corrupted (the "dog ate my computer defense").  What matters is that the plaintiffs were the intended victims of the fraud, and they were vulnerable.

The PSR also correctly applied enhancements under Section 3B1.3 because Neff used his special skill as an attorney to facilitate the offense and under Section 3C1.1 for obstruction of justice, based on Neff's perjury at trial.  Thus, the PSR correctly tabulated the adjusted offense level for Group III as 39.

Applying the grouping rules, the PSR then correctly assigned one unit to Group III, and zero units to Groups I and II, because there was more than an eight-level difference between their respective adjusted offense levels.  PSR ¶ 91.  The total offense level was 39.  The

defendant has no criminal record, which places him in category I, and gives him a Guidelines

range of 262-327 months' imprisonment and a fine range of $25,000 to $250,000.  U.S.S.G.

§ 5E1.2(c)(3), (h)(1).

## III.    ANALYSIS

### A.    <u>The Three-Step Process</u>

The Third Circuit has set forth a three-step process which the district courts must
follow in compliance with the Supreme Court's ruling in <u>United States v. Booker</u>, 543 U.S. 220
(2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they
> would have before *Booker*.

> (2) In doing so, they must formally rule on the motions of both parties and state on the
> record whether they are granting a departure and how that departure affects the
> Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which
> continues to have advisory force.

> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a)
> factors in setting the sentence they impose regardless whether it varies from the sentence
> calculated under the Guidelines.

<u>United States v. Gunter</u>, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and

citations omitted), <u>cited favorably in United States v. Friedman</u>, 2011 WL 4470674, * 14 (3d Cir.

Sept. 28, 2011); <u>United States v. Cooper</u>, 437 F.3d 324, 329-30 (3d Cir. 2006).  In calculating the

guideline range, this Court must make findings pertinent to the guideline calculation by applying

the preponderance of the evidence standard, in the same fashion as was employed prior to the

<u>Booker</u> decision.  <u>United States v. Grier</u>, 475 F.3d 556 (3d Cir. 2007) (en banc).

At the third step of the sentencing process, the Court must consider the advisory

guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C.

§ 3553(a) in determining the final sentence.  "The record must demonstrate the trial court gave

meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." Cooper, 437 F.3d at 329.  See also Rita v. United States, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); United States v. Schweitzer, 454 F.3d 197, 205-06 (3d Cir. 2006).

###    B.    A Downward Departure Would be Inappropriate

As indicated above, the defendant's properly calculated sentencing range is 262-327 months' imprisonment.  Neff is seeking a downward departure, based on an argument that the offense level of 39 substantially overstates the seriousness of the defendant's participation in the instant offense for three reasons: (1) Neff was not a principal in either the Hallinan or Rubin payday lending enterprise; (2) the fraud conspiracy was a complete failure; and (3) there is no basis to conclude that the Indiana plaintiffs could have received more at their settlement, and they suffered no actual loss.  PSR ¶ 146.  There is some merit to Neff's first argument, but the other two arguments are baseless.

As explained above, the fraud conspiracy was a success, not a failure.  The Apex 1 defense team engaged in such astoundingly dishonest tactics that they wore down the plaintiffs' lawyers and convinced them that they would be lucky to recover any money.  These tactics included: claiming all of Apex 1's loan files had been destroyed; sending letters from a high-priced law firm which stated that Apex 1 was owned by a Canadian Indian chief; Hallinan lying repeatedly at his deposition; and Dubrow engaging in egregiously obstructionist tactics. The plaintiffs did not even know that Hallinan was paying Ginger $10,000 a month to participate

in this scheme, and they lacked the government's ability to obtain Hallinan's tax records, bank records, and other admissions.  It is also irrelevant whether the Indiana plaintiffs could have received more than $260,000, but for the fraud.  The fraud prevented anyone from ever being able to find out how much the plaintiffs could have recovered.

Moreover, even though Neff was not a principal of either the Hallinan or Rubin enterprises, his Guidelines offense level does not overstate the seriousness of his crimes.  Indeed, Neff's total offense level does not even take into account Neff's participation in either RICO conspiracy.  Under the grouping rules, when one group has an offense level that is more than 8 levels below the group with the highest offense level, that group is essentially disregarded.  That is what happened here.  Neff's offense levels for the two RICO conspiracy groups are both 27, which is 12 levels below his offense level for the fraud group.  Thus, his Guidelines calculation essentially ignores Neff's knowing participation in crimes that harmed more than a million victims and deprived them of hundreds of millions of dollars.  If anything, Neff's offense level substantially understates his criminal conduct in this case.  His request for a downward departure should be denied.

### C.    Application of the Section 3553(a) Factors

His offense level should remain at 39, and his range should be 262-327 months' imprisonment.  The government respectfully submits that a sentence within, or at least close to, that range would best serve the sentencing factors set forth in 18 U.S.C. § 3553(a).  Those factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the

defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[5]

   Sections 3553(a)(4) and (a)(5) specifically direct the Court to consider the applicable guidelines and commentary, and Section 3553(a)(6) commands that the Court strive to avoid disparity in sentencing among similarly situated defendants. Collectively, therefore, they counsel for the imposition of a within-Guidelines sentence.  Section (a)(6), however, also suggests that this Court should consider the case of Muir, the lawyer who represented Tucker and was convicted with Tucker in the Southern District of New York.  Like Neff, Muir tried to hide his client's ownership of payday lending companies.  Neff, however, committed the same crime for many different clients, including Rubin, Wiggins, Miraglia, and Assenzio.  Neff also differs from Muir because of his involvement in the Apex 1 fraud scheme.  For these reasons, Neff should receive a prison sentence substantially longer than Muir's 84-month sentence.

   A prison sentence substantially longer than seven years would also be appropriate given the nature and circumstances of Neff's offenses and the characteristics of the offender.  *Id.* § 3553(a)(1).  Neff's crimes harmed hundreds of thousands of the most economically desperate people in the country.  If one thinks about it, a typical payday borrower must be both poor and

---

[5] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

employed – poor enough to need a payday loan, yet employed enough to qualify for the loan. The typical payday borrower also is honest and intends to pay back what he or she sees as a short-term loan.  That is why, as Christopher Peterson and Michael Kevitch both testified, the typical payday borrower usually pays back more in interest than he or she had received in principal.  If payday borrowers were not typically honest and earnest about trying to pay back the loans, the business model for the industry would fail.  The industry depends on the honesty and integrity of the majority of payday borrowers.  The industry also depends upon a typical borrower's ignorance about the details of the payday loan agreements that are often executed online.  As Rubin testified, payday lenders depend on borrowers being unsophisticated and not understanding all of the terms associated with a payday loan or the consumer protection laws that forbid some of those terms.

In short, the typical payday borrower looks an awful lot like Dawn Schmitt, the Nebraska school teacher who testified that she turned in desperation to payday loans after her abusive partner left her broke and without credit.  Schmitt testified that she wound up taking out about five payday loans, including one from a Hallinan company, and fully intended to pay them all back.  But she could not do so, despite her best efforts, because she was trapped in a cycle of debt caused by Neff and his co-conspirators.  As a result, she was forced to declare bankruptcy and move home to North Dakota to be closer to her parents.  Neff helped Hallinan ruin Schmitt's financial life.

Neff has demonstrated no remorse for Schmitt or any of the hundreds of thousands of other people who took out payday loans from Hallinan's companies.  He testified for four days in this trial, and not once did he express any sympathy for the plight of payday loan borrowers.  He did not care about them.  He cared only about his clients, because his clients were

31

the ones paying him.  Neff's clients were the ones who enabled him to maintain a leisurely lifestyle, with multiple properties, a sailboat, and membership at a country club.

At the trial, Neff presented several character witnesses, and he has now flooded the Court with 88 character letters.  Some letters describe Neff's kindness to his family and friends.  Many others cite Neff's sportsmanship on the tennis court.  A few letters state that Neff has "accepted responsibility" for his actions.  But not one letter suggests that Neff regrets deceiving his victims.  Not one letter claims that Neff has expressed sympathy for the hundreds of thousands of Dawn Schmitts he has harmed.  That's because Neff still thinks he did nothing wrong.  Neff has not expressed remorse, because he does not feel remorse.

It is not surprising.  As demonstrated at trial, Neff lied for years on his resume by claiming he had been an "Honors Graduate" at Bucknell University.  When confronted with this lie and the fact that he actually finished in the bottom half of his graduating class, Neff did not apologize for his deceit.  He did not even acknowledge that he had deceived anyone.  Instead, Neff tried to justify his lie by saying first, that he had been in a Bucknell Honors Society, and then that he felt justified in calling himself an "Honors Graduate" because he had studied hard while having a paper route and playing on the tennis team.  The "characteristics of the offender" in this case are characteristics of dishonesty, callousness, and remorselessness.

Sentencing Neff to a lengthy prison term would also would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).  Such a sentence also is needed to afford adequate deterrence to criminal conduct.  *Id.* § 3553(a)(2)(B).  Many of Neff's 88 character letters suggest that imprisoning him for a long time would serve no purpose because he was going to retire anyway, and he lacks the ability to commit future crimes of this nature.  But Neff is not the only

unscrupulous lawyer in this case, in the payday lending industry more generally, or in the country.  People throughout the payday lending industry are watching this case.  Lawyers are monitoring this case.  The general public has followed this case.

All of these people need to see that lawyers who use their skills to help clients commit crimes risk going to prison for extended periods of time.  All lawyers need to be deterred from abandoning their legal and ethical obligations in return for lucrative legal fees.  The imposition of a lengthy prison sentence would best serve the sentencing goal of general deterrence to other lawyers who might consider crossing the line into illegal conduct.  Such a sentence also would promote respect for the law, especially among other members of the bar.

The sentencing goal of providing Neff with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, id. § 3553(a)(2)(D), is not applicable here.

### D.   **The Fine**

The same sentencing factors that counsel for the imposition of a lengthy prison term also call for the imposition of a $250,000 criminal fine.  As stated correctly in the PSR, the Guideline range for Neff's fine is between $25,000 and $250,000.  PSR ¶ 141.  A fine of $250,000 would be appropriate given the nature of the offenses as large-scale economic crimes and the characteristic of Neff as an unrepentant, corrupt attorney.  A $250,000 fine for the law, provide just punishment, and promote general deterrence.

The PSR also makes it clear that Neff has the financial ability to pay a $250,000 fine.  The PSR estimates that Neff has approximately $1.62 million in assets, approximately $215,000 in liabilities, and a net worth of approximately $1.4 million.  On April 5, 2018, this Court entered a preliminary order of forfeiture, which ordered Neff to forfeit approximately

33

$356,000 and approximately 12.11 percent of his interest in the residence he shares with his wife in Wilmington, Delaware.  That would still leave Neff with a net worth of approximately $1 million, most of which appears to be invested in securities at Fidelity Investments.  In other words, Neff has the ability to pay a $250,000 fine, perhaps directly out of his Fidelity Investments accounts.

Notably, Neff could have liquidated some of the assets from that account in order to satisfy his forfeiture obligations, but he has taken no steps to do so.  Instead, Neff has thus far indicated that he wishes to hold on to those investments for as long as possible, perhaps in case the stock market rises.  This is not the action of a man who, according to some of the character letters, is accepting responsibility for his crimes.  Instead, it is the action of a man who wants to hold onto the fruits of his crimes.  As the Court will recall, Neff testified that there were times when he was earning about $100,000 per year from multiple payday lenders at the same time. He should be disgorged of those illicit earnings.  A within-Guidelines fine of $250,000 would serve that purpose.

## IV.    CONCLUSION

For all the foregoing reasons, the government respectfully requests that this Court sentence the defendant to at a term of imprisonment that is substantially longer than the 84-months sentence Muir received for his crimes and a fine of $250,000.

Respectfully submitted,
WILLIAM M. McSWAIN
United States Attorney

/s/ Mark B. Dubnoff
MARK B. DUBNOFF
JAMES A. PETKUN
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Government's

Sentencing Memorandum was served by email and/or the Court's Electronic Case Filing System

upon:

Christopher Warren
Counsel for Wheeler K. Neff

Date: April 12, 2018

/s/ Mark B. Dubnoff
Mark B. Dubnoff