IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : CRIMINAL NO. 16-130-2 |
| WHEELER K. NEFF | : |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant Wheeler K. Neff seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given how little time the defendant has served of his 96-month sentence, the seriousness of his offenses, and the prospect that the defendant may soon be vaccinated, based on recommendations from the Centers for Disease Control ("CDC")

**I.     Background.**

**A.     Criminal Conduct.**

Defendant Neff was a corrupt and remorseless lawyer who spent nearly a decade helping his clients prey on the financial desperation of hundreds of thousands of people across the country. As proven at trial, Neff spent nearly a decade helping payday lenders like Charles M. Hallinan and Adrian Rubin evade state usury laws so they could collect hundreds of millions of dollars in payments on loans that had interest rates exceeding 780 percent. Among other things, Neff drafted sham contracts designed to give the false impression that Hallinan and Rubin's companies were owned by Indian tribes that could

claim "sovereign immunity" from laws they did not like. Neff drafted these contacts to help clients collect unlawful debt for as long as possible without getting caught. In return, Neff received hundreds of thousands of dollars a year in legal fees.

Neff also helped Hallinan defraud nearly 1,400 people who had brought a class action lawsuit in Indiana against one of Hallinan's companies called Apex 1 Processing, Inc. ("Apex 1"). Fearing that Hallinan could face personal exposure of $8 to $10 million if the plaintiffs could prove that he owned Apex 1, Neff conspired with Hallinan to make it appear that Apex 1 had no assets, employees, or officers, and was owned by an Indian chief living in Canada in order to entice the plaintiffs to accept a discounted settlement on their claims. To further this scheme, Neff told Hallinan to change tax returns and retroactively transfer business activity from Apex 1 to another of Hallinan's companies. Neff also directed people to transfer all documents relating to Apex 1 to tribal lands in Canada, where they would never be found by the plaintiffs.

Neff then tried to deceive the jury at his and Hallinan's criminal trial. Over four days of testimony, Neff told one lie after another under oath. The jury, however, saw through Neff's perjury and convicted him of all eight charges against him: two counts of conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act ("RICO"); one count of conspiracy to commit mail and wire fraud; two counts of mail fraud and aiding and abetting; and three counts of wire fraud and aiding and abetting.

On the eve of sentencing, Neff fired his eminently capable trial counsel, Christopher Warren, Esq., because Warren refused to present specious arguments on Neff's behalf, including an absurd claim that the scheme to defraud the Indiana plaintiffs

out of their multi-million-dollar cause of action against Apex 1 was not a scheme to deprive anyone of money or property. Throughout his entire course of conduct, Neff displayed a complete lack of remorse or sympathy for his victims.

It is, therefore, not surprising that this Court ultimately sentenced Neff to a total sentence of 96 months' imprisonment, followed by three years' supervised release, and some financial penalties for his crimes. At the time, according to the PSR, Neff weighed 185 pounds, suffered from mild hypertension, and age-related macular degeneration. PSR ¶¶ 114-15. Otherwise, Neff claimed to be in excellent health for a man his age. *Id.*

Neff reported to prison on July 9, 2018, and has been serving his sentence at FCI Fort Dix, New Jersey, with an anticipated release date of May 1, 2025. He has served approximately 30 months and has credit for good conduct time of approximately four months, for total time served of approximately 34 months. He has not committed any disciplinary infraction during his time in custody.

**B.    Request for Compassionate Release.**

On November 25, 2020, the defendant submitted a request for compassionate release to the warden. The request was based on the defendant's age, as he is 72, combined with the following medical conditions: cardiomyopathy (arrhythmia/late onset atrial fibrillation), atherosclerosis, and chronic hypertension. The defendant specifically referenced an incident in July 2020 when he collapsed at the prison and had to be transferred by ambulance to a local hospital where he was treated for his heart problems for a week before returning to prison. The defendant also said that he had an as-yet untreated basal cell skin cancer and a body mass index ("BMI") of 26, which meant he

- 3 -

was "overweight." On December 10, 2020, the defendant, through retained counsel, submitted a motion to this Court for compassionate release.

The undersigned obtained the medical records of the defendant for 2019 and 2020 from BOP, and is providing copies to defense counsel. The records confirm that Neff presents cardiomyopathy, hypertension, atrial fibrillation, atherosclerosis, and macular degeneration. His body mass index was recorded as 26.9 on August 13, 2020. The defendant is fully ambulatory and engages in all normal activities of daily living (ADLs).

C.   **BOP's Response to the COVID-19 Pandemic.**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The

plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms, and also placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, all facility staff are screened for symptoms, through daily temperature checks and mandatory self-reporting of symptoms.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are very limited, but permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, the total number of inmates placed in home confinement from March 26, 2020, to the present (including inmates who have completed service of their sentence) is 20,053.[1]

---

[1] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b)

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

BOP's aggressive efforts have extended to FCI Fort Dix, the largest U.S. federal prison in terms of capacity. At FCI Fort Dix, which currently houses 2,745 inmates, there was an early outbreak in May, in which 36 inmates at the camp that is part of the institution tested positive for COVID-19. All recovered, and there was no death at the facility. At the time, a federal court in New Jersey rejected an action brought against the facility seeking declaratory, injunctive, and habeas relief, presenting a detailed opinion recounting BOP's efforts. *Wragg v. Ortiz*, 2020 WL 2745247 (D.N.J. May 27, 2020). At that time, and as the months passed, there was no positive case at all in the far larger FCI. Courts recognized this. *See, e.g.*, *United States v. Phillips*, 2020 WL 5076753, at *4 (E.D. Pa. Aug. 27, 2020) (Surrick, J.) ("The efforts made by the BOP at FCI Fort Dix have

---

(BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, No. CR 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

proven successful."); *United States v. Moses*, 2020 WL 5117978, at *4 (E.D. Pa. Aug. 31, 2020) (Padova, J.).

Then, additional and larger outbreaks began in October, ultimately affecting more than half of the institution. At present, there are 789 reported cases in the institution, and a total of 530 current inmates are deemed recovered. It remains the case that there has been no COVID-related death. The defendant was recently tested for COVID-19 at FCI Fort Dix, and on December 31, 2020, his test results came back negative.

## II.     Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of

title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[2]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

---

[2] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—
>
>     (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>     (ii) The defendant is—
>
>         (I) suffering from a serious physical or medical condition,
>
>         (II) suffering from a serious functional or cognitive impairment, or
>
>         (III) experiencing deteriorating physical or mental health because of the aging process,
>
>     that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>     (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

>   (ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D)   Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

At the present time, it is apparent that, but for the COVID-19 pandemic, the defendant would present no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution. *See United States v. Shmuckler*, 2019 WL 6257959, *5 (E.D. Va. Nov. 22, 2019) (denying request for compassionate release in a pre-COVID case where the defendant was a 76-year-old man convicted of non-violent crimes who was suffering from numerous health ailments, including a crimp in his aortic artery; macular degeneration; hypertension; esophageal reflux; mycobacterium fortuitive infection; hyperthyroidism; prostatic hypertrophy; and hyperlipidemia).

The only question, then, is whether the risk of COVID-19 changes that assessment. The government acknowledges that an inmate who presents a risk factor

identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease.[3] Here, the defendant is certainly at risk. He is 72 years old and presents a variety of heart ailments that present a risk for severe COVID-19 disease, and he is held at an institution which has suffered a very large outbreak.[4]

This Court's option, however, is limited to reducing the sentence to time served, and that would not be appropriate at this time. This Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. *See*

---

[3] Accordingly, this Court need not consider the suggestion that the defendant's condition falls under the "catch-all" provision of note 1(D), as the government acknowledges that he meets the threshold test of a medical condition defined in note 1(A). This legal issue, regarding whether at present a Court has authority on its own to identify "extraordinary and compelling circumstances" apart from those described in the guideline policy statement, has recently divided courts in other compassionate release contexts. Given the government's position that the defendant's condition passes the eligibility threshold as defined by the guideline, the issue need not be reached. However, should the Court desire further briefing on the issue, we welcome the opportunity. The government strongly objects to the notion that each court may on its own define qualifying "extraordinary and compelling circumstances," as that is at odds with the statutory direction that a reduction must be consistent with the guideline policy statement. This incorrect proposition pays insufficient heed to the statutory language and precedent, and aims to institute a parole system entirely at odds with the structure of sentencing under the Sentencing Reform Act.

[4] The defendant's BMI is within a range that the CDC states "might" present a risk.

*United States v. Doe*, -- F. App'x --, 2020 WL 6328203 (3d Cir. Oct. 29, 2020) (per curiam; not precedential).

At present, the defendant's medical conditions are managed at the facility, which also acts to treat any inmate who contracts COVID-19.

Further, the nature of his offenses does not support release after service of less than half of the sentence. For nearly a decade, Neff helped his clients prey on the financial distress of millions of people, many of them older and in poor health. This man who now seeks compassion from the Court acted wholly without compassion toward the millions of people he and his clients harmed. Neff helped loansharks like Hallinan, Rubin, and others collect hundreds of millions of dollars from the downtrodden through usurious interest rates on payday loans; he helped Hallinan defraud the Indiana plaintiffs out of a multi-million-dollar cause of action; he committed perjury through four days of trial testimony; and he has never admitted any wrongdoing.

The defendant fails to demonstrate how release, 34 months into a 96-month sentence for his serious economic crimes, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, the defendant's managed medical condition, and the amount of time remaining on the defendant's sentence. *See United States v. Pawlowski*, 967 F.3d 327 (3d Cir. 2020) (Danbury inmate suffers from hypertensive heart disease, COPD, dyspnea (shortness of breath), and sleep apnea, and has only one lung as a result of a pulmonectomy, putting him at risk from COVID-19, but

the district court did not abuse its discretion in concluding that release, after only 19 months of a 180-month term for public corruption, is not warranted under the 3553(a) factors; the court properly relied on the limited time served, the seriousness of the crime (political corruption), and the sentencing disparity with a co-defendant's sentence that would result if the defendant were released), *affirming United States v. Pawlowski*, 2020 WL 2526523, at *4 (E.D. Pa. May 18, 2020) (Sanchez, C.J.).

To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. A court recently accurately summarized: "The common features of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic are either (1) properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that could warrant release even in the absence of a pandemic, or (2) in cases where the defendants had severe medical conditions that placed them at high risk of coronavirus complications, were housed at a facility with confirmed cases, and had served a large majority of their sentences." *United States v. Ball*, 2020 WL 4816197, at *6 (E.D. Mich. Aug. 19, 2020). *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (Brody, J.) (release granted where defendant is vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver

disease," has only one year left on 20-year sentence for nonviolent drug offense, and has exhibited good behavior); *United States v. Nunez*, 2020 WL 5237272, at *7 (E.D. Pa. Sept. 1, 2020) (Sanchez, C.J.) (release granted after 47 months of a 72-month term for drug and firearm offenses, "because Nunez presents a unique case in which he provided substantial assistance to authorities, shows significant rehabilitation, and faces an increased risk of severe illness" from obesity, tuberculosis, and gout); *United States v. Gutman*, 2020 WL 2467435 (D. Md. May 13, 2020) (56-year-old has hypertension and multiple sclerosis; has served four months of six-month sentence for nonviolent offense).

This Court and others have denied release in circumstances comparable to those presented here. *See, e.g.*, *United States v. Kolodesh*, 2020 WL 5292145 (E.D. Pa. Sept. 4, 2020) (Robreno, J.) (58-year-old defendant who committed $16 million Medicare fraud suffers from heart disease, obesity, and other conditions; relief is denied because of the nature of the offense, lack of remorse, and the fact that he has served only 75 months of the 176-month sentence); *United States v. Tartaglione*, 2020 WL 3969778, at *7 (E.D. Pa. July 14, 2020) (Slomsky, J.) (reduction of 82-month sentence, which itself was a downward variance, after two years, would be inappropriate, where the defendant committed a $2 million fraud against a public health clinic); *United States v. Buckman*, 2020 WL 4201509, at *5 (E.D. Pa. July 22, 2020) (Surrick, J.) (reduction of 42-month sentence for $3 million mortgage fraud, after 15 months, would undermine the purposes of sentencing); *United States v. Hill*, 2020 WL 4431530 (E.D. Pa. July 31, 2020) (Kearney, J.) (57-year old presents obesity and heart disease, but he is a serial, career fraudster; relief denied with 25 months remaining on 60-month sentence),

*reconsideration denied*, 2020 WL 4736032 (E.D. Pa. Aug. 13, 2020); *United States v. Brigham*, 2020 WL 5995188 (E.D. Cal. Oct. 9, 2020) (72-year-old suffers from numerous ailments and is eligible for consideration, but relief is denied 33 months into 60-month term for violation of supervised release because he is a "career con man"); *United States v. Murtha*, 2020 WL 4282166 (D. Conn. July 27, 2020) (the defendant, now 64, was an attorney who defrauded clients and brought the legal system into disrepute; reduction of 78-month sentence after two years would not be consistent with the purposes of sentencing); *United States v. Hallahan*, 2020 WL 4193112 (C.D. Ill. July 21, 2020) (defendant is 73 years old and suffers from Parkinson's disease, diabetes, hypertension, and end-stage renal disease, but he committed an egregious fraud for 11 years and then was a fugitive for 12 years); *United States v. Tull*, 2020 WL 6381250 (D.N.J. Oct. 30, 2020) (relief denied to 75-year-old woman suffering from asthma, cerebrovascular disease, and hypertension, as those conditions are not extraordinary, and she has served less than ¼ of a 94-month sentence for a $13 million fraud); *United States v. Bernard*, 2020 WL 6689798 (D.N.J. Nov. 12, 2020) (72-year-old presents obesity and hypertension, but relief is denied because he has served less than half of 96-month sentence (that itself resulted from a cooperation departure) for a serious corruption offense); *United States v. Genovese*, 2020 WL 4004164, at *3 (S.D.N.Y. July 15, 2020) (denying relief regardless of health to "serial fraudster" after 29 months of 140-month term for harmful $13 million fraud); *United States v. Lytle*, 2020 WL 4747609, at *7 (D.S.D. Aug. 17, 2020) (85-year-old is two years into 144-month sentence for misbranded medical devices, and suffers from many ailments; relief is denied, in part

because he "was continuing criminal activity into his early eighties despite having those physical issues and was unrepentant to the very end of his case, indicating that he remains a danger to resume fraud schemes.").

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

                                      Respectfully yours,

                                      WILLIAM M. McSWAIN
                                      United States Attorney

                                      */s Robert A. Zauzmer*
                                      ROBERT A. ZAUZMER
                                      Assistant United States Attorney
                                      Chief of Appeals

                                      */s Mark B. Dubnoff*
                                      MARK B. DUBNOFF
                                      Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Adam Cogan, Esq.
218 West Main Street
Suite A
Ligonier, PA 15658

*/s Mark B. Dubnoff*
MARK B. DUBNOFF
Assistant United States Attorney

Dated:  January 11, 2021.